Good afternoon and may it please the court. My name is Sean Malone on behalf of Eric Navickas and Jay Leininger. Much of the issues that we're going to be speaking about today, like the last case, are occurring within the Ashland Creek watershed. That includes the research natural area, which is wholly located within the watershed, and then the MS-22, that is the Restricted Watershed Management Strategy that was also just discussed. Just as a little bit of background, the magistrate judge, whose opinion, except for the MS-22 aspect of it, indicated that these areas within the watershed contain steep slopes, highly erodible, decomposed granitic soils, and that standard logging poses significant risk of damage to that watershed. And that is why these two issues are very important before the court today. And that's at excerpts of record 20, and then I believe the magistrate judge was quoting from excerpts of record 298 in the record. The AFR project, the Ashland Forest Resiliency Project, has been moving forward for about four years now. We've had four years of fuels reduction and other components fulfilling the objectives of the project. The appellants have not sought to preliminarily enjoin any aspect of the project thus far, and therefore have narrowly tailored their relief to, in plain of size, the most egregious aspects of that. The first issue I'd like to address is the National Forest Management Act issue related to the restricted riparian and restricted watershed issues, that's MS-22 and MS-26, that was just addressed. But I don't think we have to get into the math of it all here and the percentages, because the magistrate judge, Judge Clark, found that the project admittedly violated both of those standards. But let me just jump into my core question there. So in saying that there was a violation of NFMA, everyone is looking at this language in the EIS. Well, the EIS is an analysis of the environmental impacts of a project, and the project is described in the ROD. So the exact language says, for activities to meet acceptable levels of soil loss and soil management objectives, based on implementation monitoring, the minimum percent of effective ground cover following cessation of any soil-disturbing activities for this project is shown in Table 315. So Table 315 shows what the minimum percentage effective ground cover is for activities to meet acceptable levels of soil loss and soil management objectives. What that doesn't tell me is whether the project, as approved in the ROD, will necessarily have that effect. It just says, here are the minimum percentages. Because the ROD itself says the project will comply with the LRMB. We certify that the project will comply with the LRMB. So unless the project necessarily will meet these, will expose this amount of soil, I don't see why the FEIS is binding on the nature of the project in any way. So maybe you could explain that point to me. Sure. I think it's sort of an interesting relationship between an environmental impact statement and then the specific decision document here, the record of decision. Because you're making a NFMA argument, not a NEPA argument, on this point, correct? Correct. So in other words, we would have to say that the decision that the agency made was arbitrary and capricious because it was in violation of a legal standard in the LRMB. The FEIS really just analyzes potential environmental impacts. It's not the decision itself. That is correct. The FEIS contains the bulk of the environmental analysis on which that record of decision is based. And to the degree that the record of decision, the record of your Honor quoted from, I believe, the record of decision and just said we will satisfy these criteria. To the extent that that's sort of conclusory, it would seem that they were likely relying on what was going on in the environmental impact statement. So much of what occurs in these records of decisions or decision notices, the decision documents, refers back to the NEPA document that it's all coming from. And that's where the bulk of the analysis is. I think the record of decision is, generally speaking, pretty short, brief, whereas the EIS or EA, if it were the case, are pretty lengthy documents that contain the bulk of the analysis. So you do have the record of decision as the decision document, and that's what we're challenging. But that's what we're looking at, right, is the record of decision. And the decision says we'll comply with the LRMP. Now, if the EIS says we've looked at this project, and the project will necessarily result in this amount of exposure, then you would say there's some conflict here, because they've approved a project that will necessarily cause this amount of exposure, and that amount of exposure is inconsistent with the plan. But I'm having trouble reading this language to say that. It's not phrased in those terms at all. So I think you need to explain to me why this language in the EIS means that the project will necessarily have this amount of exposure of soil, of ground cover. I think it's because that's the overall goal of the EIS, is to disclose those environmental impacts. And if the agency acknowledges that those standards and guidelines in the Rogue River Siskiyou National Forest Plan will be exceeded, then ‑‑ But this language doesn't even say that. It doesn't even say this is what the project will cause. It says here's what you need to do to meet the minimum percent effective ground cover. To meet acceptable levels of soil loss and soil management, here is what the minimum percent of effective ground cover is. So it doesn't even say anything particular about the project. It's phrased in this strange way. So I think maybe I understand what you're saying is that ‑‑ are you saying that that is sort of just a restatement of the standards and guidelines? Well, it doesn't say the project will necessarily cause this, and it's okay. It says here's what the project needs to do to be acceptable environmentally. And the Forest Service now, post‑talk, has been scrambling around to say, well, we can have our project and be consistent with the LRMP. And so unless ‑‑ and it isn't necessarily the case that we're going to expose so much more ground than is allowed. So if, in fact, the project can comply with the LRMP, which is what the Forest Service is telling us, and the LRMP says in their ‑‑ or the Forest Service says in the record of decision, we intend to comply, then I guess I'm having trouble seeing where there is a NIFMA violation. Okay. I understand. I think the way that they're characterizing that table, and it is set out in not the clearest terms possible, as Magistrate Clark indicated, sort of an inverse table that they put together there. But what it's doing is it's putting together the first year and the second year and saying this is what the effective ground cover will be at this point in time. But it doesn't say that. It doesn't say this is what will be the ground cover. It says this is what you need to comply with. I think if that were the case, then that would just essentially be a restatement of that Forest Plan standard and guideline. But erroneous, correct? I mean, because what they say is what you need to comply with is wrong compared to the plan. It's less protective than the plan. So it seems like if the understanding is that they are essentially restating what the Forest Plan standards and guidelines are, then, yes, it's erroneous. But I think what it's more properly understood as and what happens in these environmental impact statements is that's the environmental impact that would occur from the ground disturbing activity. And you're inferring that, or can you point me to any language that says that? I guess I could put it this way, is that that's the only disclosure of percentage soil cover that exists in that EIS. And without that table, we have no information related to what that percentage is. Perhaps counsel can point us to, opposing counsel can point us to another table or other areas in which they'll show that effective ground cover. But from my review of the EIS, and then counsel's argument below never said that, you know, this is not just what the impact will be, but this is what we need to do. So I think that it's not a restatement of the Forest Plan standard and guideline. And it's the only place in which they're discussing in percentages, which is how the standards and guidelines talk about this. That's the only place in the EIS in which I've seen. Okay. So you would say you infer just from the context that this is a statement of the impact on ground cover that this project will have, and then go on to say and it's acceptable environmentally. And so when the Forest Service approved the broad or adopted the record of decision, it was approving a project that would have this effect on ground cover. That's your argument, right? Correct. Yes. I think the biggest point there is that this is the only place in which they're giving us any information on that percentage of effective ground cover. And without that, it would be impossible for anyone to ascertain what that effective ground cover from the project would be. So is there, I mean, my colleague has enunciated this particular situation far better than I could have, so I thank her for that. I agree that that is a problem, too, in the sense that what they've disclosed     And I don't think it's a violation because it is a problem that I see. But I guess I'm trying to figure out if the ROD says they'll comply, and all we have is this, if you will, this FEIS that says something different, if that means necessarily it's a problem. I agree that that is a problem, too, in the sense that what they've disclosed is an admitted violation. And it's interesting because neither the magistrate nor counsel for the Forest Service below nor myself saw it in those terms, as Judge Akuta had suggested earlier. But I think the critical point is that the Forest Service needs to set out the information for the public in order to determine whether standards and guidelines are met. And that's the only aspect, the actual hard data, as opposed to perhaps a conclusory allegation in the ROD, the record of decision. It's generally true that the record of decision sort of links back to the NEPA document that it's related to, and that's where the bulk of the information is. What you find in a ROD is essentially, it's also called a finding of, well, in certain circumstances, but it's sort of generally a restatement of what they had in more concise terms in the EIA. But I guess, I mean, the NEPA document is looking at whether there's a significant environmental impact. And it says, look, if you can have this amount of exposure and not have that sort of impact. The LRMP puts a more protective standard, so there really wasn't any need to analyze the more protective standard. It wouldn't raise a NEPA issue if that had been raised. But they're compelled by their, by the LRMP and by their decision to meet the more protective standard. So given that the environmental impact statement analyzed a less protective standard and said no significant environmental impacts, I guess what's the problem with the Forest Service saying, but as a matter of law, we're bound to a more conservative standard and that's what we'll do? I suppose I don't understand what you mean when you say there's a less protective standard. Well, in the EIS, they allow more soil exposure, correct, than is allowed by the plan. But they say as long as you don't go over these amounts, it won't have a significant environmental impact. We're disclosing this amount of exposure and we say it's okay environmentally. I think I understand what's going on. So when an EIS is performed, there's already an acknowledgement that there is a significant environmental impact. It's the environmental assessment, which is sort of a mini-EIS, that is used to determine whether there is a significant impact. They've already conceded that there's significant impact by doing the EIS. And that's why when you have an environmental assessment on the EA, with the decision document there will be what's called a FONSI, a finding of no significant impact. And so you wouldn't have to, the agency wouldn't have to prepare an EIS after that. So an EIS is for those circumstances in which there is a significant impact. And I think this effective ground cover standard, the standards and guidelines that are in the LRMP, the forest plan, must be complied with. As Judge Milan-Smith in the 2007 case that was just presented, the ONRC case, said that there's no de minimis exception to the National Forest Management Act's requirement to comply with standards and guidelines. And it's to the extent that, as far as I can tell, that's the only portion of the entire EIS that provides us some hard data in terms of percentages and figures in which to address. So how do I read this? For activities to meet acceptable levels of soil loss and soil management objectives. So they're saying this meets, if they meet these less protective standards, it's acceptable. It's an acceptable level of soil loss and soil management. Is that speaking from a legal perspective or from an environmental perspective? To the extent that that is attempting to say what they can meet, that is just, that's in conflict with the standards and guidelines of the forest plan. The EIS does not create a new standard in which they can, I guess, obviate the standards and guidelines in the forest plan. This is a NIFMA claim. The NEPA document is simply there to provide the information to determine whether we're complying with that forest plan standard and guideline. I had intended to reserve five minutes. I think I'll do that right now unless there's any other questions. No. Thank you. May it please the Court. My name is Peter Kraswicki, and I represent the United States Forest Service. This case regards a challenge by two individuals to the Ashland Forest Resiliency Project, which seeks to protect human life, the water supply for the city of Ashland, and the environment from a large-scale, high-intensity wildland fire. The Forest Service developed this project through a collaborative process, engaging numerous stakeholders, including the city and the Nature Conservancy. The project is ongoing and has a multiparty monitoring effort that involves conservation groups and the community. The project represents the Forest Service's best effort to lawfully harmonize these perspectives with the need to address significant potential for large-scale, high-severity wildland fire. I want to briefly respond to one of the remarks fellow counsel made or brother counsel made. He suggested that there we don't understand or that there is no de minimis violation to NFMA. In doing so, I believe he misses Judge Aikuda's point, which is that the treatments here substantively comply with the standards. The record of decision states that they comply with the standards. We have complied with the standards throughout. We are currently complying with the standards in this ongoing process. So opposing counsel says, look, the EIS discloses what the impact is going to be on ground cover, on its soil exposure, and the record of decision was based on the understanding that the project would have that environmental effect, would have that amount of exposure. And if you compare that to the LRMP, the LRMP is more protective. And so the ROD, therefore, opposing counsel argues, violates NFMA violations, arbitrary and capricious, because it approved a project that violated the LRMP standards. And I didn't see in your briefing anything really arguing that point. So we don't contend that the standards are different, obviously, from what the way they are stated in the Forest Plan. Below, the magistrate dealt with two arguments. And both of them, and they dealt with how much time we had to comply with these standards and what the standard and whether or not the standards were binding. But in response to what the magistrate said, we recognize that the project is minimally impactful, which is the argument laid out in this brief. Helicopter tree removal exposes between 0 to 3 percent of ground cover, which is well within the 85 percent required by the MS-22 standards identified by the magistrate. Moreover, we discuss the detrimental impacts of the soil to soils, and that can be found at Excerpts of Record 580, where we found 44 total acres of disturbance due to helicopter tree removal. In addition, in response to comments to the draft environmental impact statement, we said, and I quote, the attainment of standards and guidelines can be assured due to the degree and types of actions being proposed. Helicopter yarding has minimal impacts on soil. Helicopter yarding is the same thing as helicopter tree removal. That's found in Excerpts of Record 813. All of this is to say that we have always recognized this project to be minimally impactful because the way the trees are actually being removed isn't by tractors unless that's above, unless on all slopes above 20 percent. But doesn't that just conflict with the FEIS, what you're telling me here? No, Your Honor. Because the FEIS is put together in order to say what's going to happen, in order to say what's going to be the potential. And, therefore, he's suggesting the ROD can say all it wants about we'll comply. The FEIS says we're going to go over the water plan or we're going to go over the plan standard, and, therefore, it's a violation. Your Honor, the FEIS, first of all, doesn't set specific amounts for what treatments are going to do. Well, I understand, but it gives a projection, wouldn't you suggest? Why do it if it isn't going to project? Well, so the other thing is the FEIS, it's not as specific as would be ideal. For example, they group together severe and very severe, and then they say in year one they'll meet 70 percent, they will be greater than 70 percent, and in year two they will be greater than 85 percent. Now, effectively, that pulls up and is more protective on severe slopes, which only need to ever be at 70 percent or greater. And always we don't, we lack the specificity because we don't ideally state, you know, this is exactly the amount or the projected amount. We say it will be greater than this number. At most, this is sort of, you know, a misconception of the standards, as I believe was the point of Judge Aikuda when she was addressing Brother Counsel. However, it doesn't project as to what the actual ground cover that's going to be retained is. Well, my worry is this. It's the first time I've ever had the Forest Service come in and say, we put an FEIS together, it says this, and we put a rod together and it says we'll comply, but don't worry about the FEIS, just worry about the rod. And the way to get around that in this particular situation that you've used is to put together a post hoc declaration by somebody who comes in to say, we're doing it. And I've never seen that happen before. And so I'm saying to myself, why should I go along with that? Your Honor, the Bougier Declaration does its best to explain why the impacts will be minimally, why the impacts of helicopter logging are not that great. I'm sorry, my phrasing. But the project as described in the FEIS wouldn't require the Forest Service to take the steps that are laid out in the Bougier Declaration. So the project, if we took the FEIS as being the description of the project and the impacts it would have that were then approved in the rod, you could do all sorts of things up to this amount of exposure, which would violate the LRMP. And then you're saying post hoc, well, but we don't intend to do that. Your Honor, the Bougier Declaration does its best to explain the, both the FEIS and the record of decision. The record shows how minimally impactful helicopter tree removal is. And I cite the supplemental excerpt of record at page 100. The end, we have always required, and plaintiffs acknowledge we've always required, that above, at above 20 percent slope, which is in the category of moderate based on the forest plan, we are going to only remove trees with helicopters. So, and the --- How do you select the trees that are removed? Your Honor, this is based on, as is explained in my brief in Appendix D, the Forest Service lays out a series of prescriptions and makes a target density that has to do with fire, that has to do with its fire resiliency goals. Well, this is a fuel reduction program. Yes, Your Honor. What's the difference between fuel reduction and ordinary forestry husbandry to maintain the quality of the forest? That is, removing gulls and diseased and catfish and gulls and all that stuff. What's the difference between this kind of fuel reduction and ordinary forestry husbandry? Your Honor, I believe that the answer to your question is, it's the purpose that is being served and what they're, and what, for lack of a better word, they're trying to optimize for. The Forest Service here is certainly or is trying to optimize for the diminished risk of fires throughout the watershed, as I said, in order to protect human life, the environment, and the City of Ashen's trinket water. But it's not just that they are undesirable, Your Honor. They are the – the problem is because they've been so undesirable for so long, the forest has grown out of proportion because we have for more than 100 years now had effective means of suppressing fires. However, that has ignored the ecological consequences of that fire suppression, and it's only been of late that we have begun to fully appreciate the need to keep fire, the need to keep fire happening so that it can benefit the species that grew up being dependent upon that fire existing. If you would, I'd like to find out which one of the, if you will, reasons for allowing supplemental evidence in this kind of a hearing you think the affidavit complies with, because it seems to me that the affidavit at best or the declaration only demonstrates that the Forest Service complies with the standards, even though the project as planned did not. And that is not one of the standards. So where am I supposed to get this affidavit in? Your Honor, so there are a few points. There are four ways to get it in. Which one is your best? I believe that this explains the record and is therefore not post hoc, because it doesn't add anything to the record. Well, but just a minute. It's the only thing I've got in here that suggests that we're going to comply with the standard, because if I look at the project from the FEIS, it's not going to comply. The only thing that says it's going to comply is reading the rod saying we'll comply, even though the FEIS says we won't. And this coming in to suggest this is the way we're going to do it, which wasn't in the record. Your Honor, there are a number of places in the record both where helicopter tree removal and the issue of lop and scatter are discussed. And it isn't – and so my best explanation for it is it's an elucidation. It is helping to explain what was already there. It doesn't further any particular – it doesn't add a post hoc rationalization. It doesn't explain anything that wasn't already in the record. Furthermore – But the record, that part, the sites you provided, it doesn't tie the Forest Service's hands just to helicopters. It talks about other things like skyline, something skyline forestry. I don't have the right terms. So it described a range of possible foresting approaches that could be taken. And so it is not like the Boucher Declaration, which says this is all we're going  That does seem to be post hoc. Well, Your Honor, I believe that at – I believe that at excerpts of record 612, there is a discussion of that the preferred alternative will use helicopters to do all tree removal above 20 percent. And so the range of – the range – and I also believe that in response to one of your earlier questions, in the record of decision, excerpts of record 1162 to 1163, they discuss the full range of yarding techniques. And my understanding is there are really only two. The trees are going to be removed either by helicopter or by tractor. And tractors will only be used at 20 percent slope – at 20 percent slopes or below, because tractors are the most – are a much more impactful form of tree removal. Where did you say that was? So the – so there are two places for this. The record of decision at excerpts of record 1162 to 1163, and then there is a discussion of simply when helicopters will be removed – will be used in the environmental impact statement, and it explains that the – and it also explains the 20 percent threshold, and that is at excerpts of record 612. Thanks. Moving back to – So – so supposing that we were to suggest this just doesn't cut it on this particular issue, but the other issues we – we can see you right. What would be the case then? Well, Your Honor, so I believe that – so there is – there's sort of a practical and a pragmatic issue here, which is that we've explained, however you find it, how we're going to comply with the standards. The – there is precedent in this Court that discusses in dealing with what remedy is appropriate, and I'm citing Friends of Clearwater v. Dombeck, that says, look, if they – if you know, and we've already done the work to say this is how we're going to comply with the standards, it doesn't make sense to remand to the agency to have them issue another sheet of paper that says we're going to do exactly what we've said – what we've represented before the Court, and, you know, and we certainly don't want to consider ourselves bound by the statements we've made both to this Court and the district court. And so we – the appropriate remedy in our minds is affirmance because we've explained everything that we're going to do and how we're going to comply with all relevant standards. In – I would like to turn back to, as I was about to, Judge Goodwin's point, which I do believe was going to the plaintiff's discussion of the National Environmental Policy Act. We believe that the environmental impact statement is fully compliant with the standard. It explains the impacts and where they will be located and the prescriptions that will be used. The – the Appendix D is on a – is a very detailed discussion that is the basis for all of the treatments that are then applied. And it gives you both the – the Plaintiff's Association group, which correlates exactly with the map on 4 – or correlates with the map on Executive Record 480, and then also the strategic category, which then is mapped out for you at Executive Record 473. All of this is detailed information sufficient for the public as well as decision makers on the project and its impacts. And then there is, you know, a wealth of information in terms of the 11 – 11 significant issues and the 18 other issues as to what these treatments will then – the impacts they will then have on the Ashland watershed. I – do Your Honor have any further questions? I have none. Apparently not. Thank you. I will cede the rest of my time. Thank you, Your Honors. I think one of the more fundamental points that we need to keep in mind here is that my clients have challenged final agency action. And I think absent withdrawing, modifying, or supplanting the record of decision or the analysis contained in the EIS, the violation of the ground cover standards is still on the books. It's still effective. There's nothing preventing the Forest Service, legally speaking, from going forward and continuing to violate those. Well, the LRMP is the legal standard, right? So they can't violate the LRMP standards consistent with the LRMP, which is they're legally bound. So there certainly is a legal constraint. The issue is whether they approved a project that was unlawful because it incorporated these FEIS exposure limits. Correct. And they say, look, it's a futile act. We have to send it back, as we've already said, in open court and bound ourselves to complying with those standards as we said in the Rod. So why should we send it back anyway to correct? Is this to inform the public? Or why should it be sent back? Because I do think it's a fundamental point of administrative law, just as the Supreme Court has said in SEC v. Channery, which they call it a simple but fundamental rule of administrative law, is that we judge the agency's action and the rationale given at the time of that agency action, not something, not some declaration provided three years after project implementation, one year after it was fully briefed. I think Judge Hagerty from the District of Oregon sort of addressed this issue on point, and we put it in our brief. And just a quote from him quickly. He said, "...allowing parties to submit additional evidence in anticipation of an adverse ruling after a dispositive motion has been fully briefed and a recommendation has been issued would undermine the efficient resolution of disputes and the finality of this court's order." And I think beyond the sort of administrative procedures act part of all of this is that the remedy was not just helicopter logging, but it was also spreading slash on the ground to cover areas in order to do that. That's part of the post hoc rationalization from the Boucher Declaration. And what we've seen is that that is conceded in the FEIS that states that doing so increases the risk of fire. The whole point of this project has been to reduce the fuel loading, so much so that in excerpts of Record 930, the Forest Service even proposed helicoptering out this extra slash in fuel. Well, when the Forest Service is doing forestry management, they'll take that slash and pile it up and let it get dry, and then in the winter when there's snow on it, they'll burn it. That's correct. There's nothing wrong with that. Why aren't you hollering before you're hurt? I think in the circumstance that you're speaking of, they pile it in piles over here, and then they'll burn it. Well, I'm in Sisters, Oregon. I'm surrounded by forest operations. I see them every day. I smell the smoke. Sure. These prescribed burns. So I know what's going on. Owen Banner, I've known him 50 years. He knows more about trees than anybody in this room. Yeah. He grew up in Oklahoma. He discovered Oregon and has been here for the last 60 years doing very well and knowing all about trees. So I think the distinction is that in the circumstance you're talking about, they pile it up, but in the remedy, the post-hoc remedy that they're talking about, they would just spread it everywhere in order to make more effective ground cover. Well, it's 20 percent ground. I'm not sure how it's going to stay there. Piling brush is probably the best way to get rid of it. Well, with that, I see I'm out of time pretty much, and we would just respectfully request that the circuit court reverse the district court's opinion and remand to the agency. Thank you. All right. The case of Nagikis v. Conroy is submitted, and we're adjourned for this session. Thank you.
judges: Goodwin, Ikuta, Smith